IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SPECIALTY GRAPHITE SERVICES, INC** <br> *a Pennsylvania Corporation*, <br><br> **Plaintiff,** <br><br> v <br><br> **RODNEY J. CHIODO** <br> *an individual*, <br><br> **Defendant.** | ) <br> ) <br> ) <br> )  2:11-cv-1438 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Pending now before the Court is Defendant Rodney J. Chiodo's MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE (Doc. No. 6), with memorandum of law in support (Doc. No. 7). Plaintiff responded in opposition to Defendant's motion to dismiss (Doc. No. 8), to which Defendant, in turn, replied (Doc. No. 11). The issue has been fully briefed and is ripe for disposition.

**Statement of the Case**

Plaintiff Specialty Graphite Services, Inc. ("Plaintiff SGS" or "Plaintiff corporation") initiated the above captioned action with the filing of a five count complaint on November 10, 2011. Doc. No. 1, Complaint. Plaintiff SGS is a Pennsylvania corporation that is engaged in the business of warehousing and selling graphite electrodes and specialty graphite. *Id.* at ¶¶ 1 & 2. Pennsylvania resident Defendant Chiodo was employed by Plaintiff SGS as its President, Secretary, and a director until his resignation on May 13, 2011. *Id.* at ¶ 4. A brief explanation of how Plaintiff corporation came into being is appropriate for an understanding of Plaintiff's claims.

Keith Kearney is the President and owner of Graphite Electrode Sales, Inc., ("GES"), a business corporation headquartered in Birmingham, Alabama. *Id*. at ¶ 7. In and before 2007, Mr. Kearney was interested in establishing a warehouse in Pennsylvania and a distribution capability there for GES' products and for specialty graphite. *Id*. at ¶ 8. In and before 2007, Defendant Chiodo was employed in a sales management capacity by a competitor of GES, Graphite Sales, Inc., a corporation with offices in Ohio that sold graphite electrodes, specialty graphite, and machined graphite. *Id*. at ¶ 9. At some point, contact was made between Defendant and Kearney, wherein Defendant represented that he had no legal impediments to his engaging with Kearney in a graphite business, and that he had resigned his position with Graphite Sales, Inc. *Id*. at ¶ 10. An agreement was reached between the two wherein Defendant took steps to incorporate Plaintiff SGS as a Pennsylvania corporation, and would serve as the President and Secretary of the corporation, as well as being appointed as a director. *Id*. at ¶ 11. Defendant also signed a Nondisclosure, Noncompetition and Nonsolicitation agreement (a copy of which was attached to the Complaint as exhibit "A"), and a stock purchase agreement with Plaintiff (attached to Complaint at exhibit "B"), and proceeded to operate Plaintiff corporation for several years without ever disclosing that he had, all the while, also not actually resigned from Graphite Sales, and continued to be employed there in his sales management position. Doc. No. 1, Complaint at ¶¶ 12 – 18. On May 13, 2011, Defendant sent a letter to Kearney, attached to Complaint as exhibit "C", wherein he informed Plaintiff SGS and Kearney (who was the majority shareholder of SGS) of his "unfaithfulness only after … Graphite Sales, Inc., his other employer discovered it and confronted him, thus making it certain that SGS and its majority shareholder would have learned of it from Graphite Sales, Inc." *Id*. at ¶ 19.

It is upon this factual predicate that Plaintiff now brings five counts against Defendant. Plaintiff pleads subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as an action founded, in part, on the laws of the United States, and 15 U.S.C. §§ 78aa, and brought under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), as well as supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a).  More specifically, Count I alleges the § 10(b) violation; Count II alleges common law fraud; Count III alleges a violation of the Pennsylvania Securities Act; Count IV alleges a breach of the nonsolicitation contract; and Count V alleges a breach of fiduciary duty.  Defendant has moved for the dismissal of Counts I, II, and III either for a failure to state a claim upon which relief can be granted or because those claims are now moot, and for the Court to further decline to exercise supplemental jurisdiction over the common law and state law claims.  *See* Doc. No. 7.  The Court begins with Count I, the federal law claim, which alleged:

21. The terms and conditions of the Stock Purchase Agreement were negotiated using the telephone, mail and interstate electronic communications between the representatives of Mr. Kearny and SGS, who were in Birmingham, Alabama, and defendant in Pennsylvania.

22. The facts that defendant was, at the time the Stock Purchase Agreement was negotiated and signed, still an employee of Graphite Sales, Inc., a competitor of SGS and GES, and intended to continue in that role, were material facts that defendant did not disclose in purchasing the SGS stock, inasmuch as they gave rise to a severe conflict of interest.  Defendant's failure to disclose these facts was done with the intent to deceive the plaintiff.

23. If defendant's conflict of interest had been disclosed, the Stock Purchase Agreement would not have been entered into by SGS.

24. Plaintiff and its majority shareholder relied upon defendant's misrepresentation that that he had left his employment with Graphite Sales, Inc. in entering into the sale and purchase of its stock.

25. Plaintiff has demanded the return of the common stock purchased by defendant, but defendant has failed and refused to return the stock, despite his fraud in acquiring it, and continues to hold the stock.

WHEREFORE, plaintiff prays for judgment in its favor on this Court, and for an order rescinding the Stock Purchase Agreement and directing that the share certificates be endorsed and delivered to the plaintiff, and for such other and further legal and equitable relief as may be warranted.

For the reasons that follow, the Court will dismiss Count I for the failure to state a claim for which relief will be granted, and will further decline to exercise supplemental jurisdiction over the remaining claims.

### Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Twombly*, 127 S.Ct. at 1964–65 (2007) (quoting *Conley*, 355 U.S. at 47), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level ...." *Id.* at 1965 (citations omitted). To survive a motion to dismiss, a civil complaint must allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S.Ct. 1937, 1950–51, 173 L.Ed.2d 868 (2009) (confirming that *Twombly* applies to all civil cases).

The Court must accept the allegations in the complaint as true. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *see also Twombly*, 127 S.Ct. at 1965 (courts must assume that "all

the allegations in the complaint are true (even if doubtful in fact)"). The Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). However, the Court does not need to accept as true a plaintiff's "unsupported conclusions and unwarranted inferences," *Doug Grant v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir.2000) (citing *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 n. 13 (3d Cir.1998)), or a plaintiff's "bald assertions" or "legal conclusions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997).

Section 10(b) of the Securities Exchange Act forbids (1) the "use or employ[ment of] … any manipulative or deceptive device or contrivance," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b) (2010). SEC regulations, in turn, make it unlawful "[t]o make any untrue statement of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b)(2010)("Rule 10b-5"). The United States Supreme Court has identified the six required elements of a Securities Exchange Act § 10(b) private damages action:

1) a material misrepresentation (or omission);

2) scienter, i.e., a wrongful state of mind;

3) a connection with the purchase or sale of a security;

4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transactional causation":

5) economic loss; and

6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss.

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)(citations omitted); *see also*, *McCabe v. Ernst & Young, LLP, et al.*, 494 F.3d 418, 424 (3d Cir., 2007).  Securities fraud actions are also subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, as well as those of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir.2010).

## Analysis

**A.    Count I:  Securities Fraud – Section 10-b5**

The United States Court of Appeals for the Third Circuit has stated that "[u]nder Rule 10b-5, causation is two-pronged." *McCabe*, 494 F.3d at 425 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir.2001)).  A plaintiff must show both: (1) "transaction causation" (or "reliance"), i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security; and (2) "loss causation," i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered.[1]  *Id.*  In addressing § 10(b) claims, and especially their loss causation element, the Third Circuit has distinguished between "typical" and "non-typical" claims, a distinction that is worthy of note given the facts as pled in the complaint.  *See, e.g.*, *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir.2000)("In considering loss causation, it is important to recognize ... how this case differs from the usual securities action.").[2]  In either type of case,

---

[1] The PSLRA codifies the requirement of common law loss causation: "the plaintiff shall have the burden of proving that the act of omission of the defendant … caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (2010).  *See also McCabe*, 494 F.3d at 425; *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 208 n. 15 (3d Cir. 2006).

[2] The Third Circuit noted in *EP MedSystems*, 235 F.3d at 871, that § 10(b) claims are typically brought in securities actions in which a plaintiff claims a defendant made material public misrepresentations or omissions in order to affect the price of its publicly-traded stock, i.e., to perpetrate "fraud on the market."  But *EP MedSystems* and *Berckeley* involved § 10(b) claims alleging misrepresentations or omissions that induced another party into

however, the Third Circuit has consistently required that both transaction causation and loss causation must be established in § 10(b) cases, and have never allowed the elements to merge.

"Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *McCabe*, 494 F.3d at 425 (quoting *Berckeley*, 455 F.3d at 222).[3] A § 10(b) plaintiff must show both that (1) the plaintiff entered the transaction at issue in reliance on the claimed misrepresentation or omission (transaction causation) and (2) the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss (loss causation). *Id*.

It is more difficult to categorize the required loss causation showing in a "non-typical" § 10(b) action, such as the one *sub judice*, than it is in a "typical" § 10(b) action. In a typical "fraud-on-the-market" § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff having invested in reliance on the misrepresentation or omission; to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff. *See, e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184-85 (3d Cir.2000); *see also EP MedSystems*, 235 F.3d at 884 (collecting typical § 10(b) cases).

But in a non-typical § 10(b) action, where the allegations do not involve the price of a publicly-traded security, the factual predicates of loss causation fall into a less rigid pattern. For

---

entering a private transaction. Nevertheless, *Berckeley* reaffirms that, fundamentally, the same loss causation analysis occurs in both typical and non-typical § 10(b) cases.

[3]     As the Third Circuit observed in *McCabe*, the loss causation requirement limits the circumstances in which an investor can sue over a failed investment, so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with that investment. 494 F.3d at 425. "Otherwise, for example, a seller who fraudulently induced a purchase of securities in early October 1987 would have become an insurer against the precipitous price decline caused in large part by the market crash on October 19." *Id.* (quoting 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.11[3] (5th ed.2005).

example, the plaintiff corporation in *EP MedSystems* alleged the defendant corporation had violated § 10(b) by inducing plaintiff to buy shares in defendant through misrepresentations about "imminent" business opportunities that were actually non-existent. 235 F.3d at 869. There, the Third Circuit held the plaintiff's argument that it had been "induced to make an investment of $1.4 million which turned out to be worthless" was a sufficient allegation of loss causation to survive a motion to dismiss. *Id.* at 884. And in *Newton*, a putative class of investors sued defendant broker for violating § 10(b) by executing trades at stock prices established by an industry-wide system rather than on the reasonably available terms most favorable to plaintiffs. 259 F.3d at 162. There, the Third Circuit held that the difference between (1) the price at which a trade had been executed and (2) the price at which it could reasonably have been executed could be a sufficient showing of loss causation. *Id.* at 181 n. 24.

Here, Plaintiff's § 10(b) claim is clearly a non-typical one. In return for Defendant's nondisclosure, noncompetition, and nonsolicitation agreement (attached to the Complaint as Exhibit A), Plaintiff employed Defendant and entered into an employee stock purchase and restriction agreement (attached to the Complaint as Exhibit B). However, the Court agrees with Defendant that Plaintiff has failed to state a claim for which relief can be granted. Without concerning itself in great detail with the question of whether Plaintiff has sufficiently pled a material misrepresentation, scienter, or transactional causation (based upon Plaintiff's alleged reliance upon the misrepresentation), the Court has before it no allegation of economic loss, much less economic loss attributable to the misrepresentation of Defendant. The only reference to any kind of economic valuation within the complaint involves the original transaction in which Defendant purchased 100 shares of common stock at the "nominal price of $.01 per

share." Complaint at ¶ 15.  In this regard, the Court is guided by the Supreme Court's explanation regarding the pleading standards for these causes of action in *Dura Pharm., Inc.*:

> Judicially implied private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions. *See Blue Chip Stamps*, *supra*, at 744, 95 S.Ct. 1917; *see also* L. Loss & J. Seligman, Fundamentals of Securities Regulation 910-918 (5th ed.2004) (describing relationship to common-law deceit).  The common law of deceit subjects a person who "fraudulently" makes a "misrepresentation" to liability "for pecuniary loss caused" to one who justifiably relies upon that misrepresentation. Restatement (Second) of Torts § 525, p. 55 (1976) (hereinafter Restatement of Torts); *see also Southern Development Co. v. Silva*, 125 U.S. 247, 250, 8 S.Ct. 881, 31 L.Ed. 678 (1888) (setting forth elements of fraudulent misrepresentation).  And the common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss. *See, e.g.*, Pasley v. Freeman, 3 T.R. 51, 65, 100 Eng. Rep. 450, 457 (1789) (if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action"); *Freeman v. Venner*, 120 Mass. 424, 426 (1876) (a mortgagee cannot bring a tort action for damages stemming from a fraudulent note that a misrepresentation led him to execute unless and until the note has to be paid); *see also* M. Bigelow, Law of Torts 101 (8th ed.1907) (damage "must already have been suffered before the bringing of the suit"); 2 T. Cooley, Law of Torts § 348, p. 551 (4th ed.1932) (plaintiff must show that he "suffered damage" and that the "damage followed proximately the deception"); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 110, p. 765 (5th ed.1984) (hereinafter Prosser and Keeton) (plaintiff "must have suffered substantial damage," not simply nominal damages, before "the cause of action can arise").

544 U.S. at 343-44, 125 S.Ct. at 1633.  With no allegation of loss and, by extension, no allegation of loss causation, Plaintiff has failed to state a private cause of action for securities fraud.

Beyond the defects in the allegations of the complaint, the relief sought by Plaintiff in Count I, particularly the rescission of the Stock Purchase Agreement and the return of the share certificates, are moot given the filings before the Court.  In this case, the following are obvious: Plaintiff is specifically seeking the return of the shares of common stock purchased by Defendant as the result of Defendant's alleged misrepresentation in the Nondisclosure, Noncompetition, and

9

Nonsolicitation Agreement; Plaintiff has alleged no economic loss as the result of Defendant's misrepresentation; from the outset of the disclosure of his misrepresentation (and prior to the initiation of this litigation), Defendant has indicated a willingness to dissolve his ownership interest in Plaintiff company; and Defendant has subsequently assigned his share certificates to Plaintiff. To that end, the Court notes exhibit C to Plaintiff's complaint, a letter dated May 13, 2011, written by Defendant to Keith M. Kearney, wherein Defendant offered, *inter alia*, that he "would like to dissolve all of my ownership shares of Specialty Graphite Services back to you", a step that Defendant has apparently since accomplished with the Assignment of Share Certificate executed on December 1, 2011 assigning and transferring the shares back to Plaintiff. *See* Doc. No. 7 at exhibit 1.

In the wake of both *Twombly* and *Iqbal*, the Court is expected to exercise both "judicial experience" and "common sense" when deciding a Rule 12(b)(6) motion to dismiss. *See* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004 and Supp. 2007). Here, such considerations warrant dismissal of Count I. Not only has Plaintiff failed to allege any economic loss or loss causation, but has apparently obtained the relief specifically requested in Count I, the § 10(b) cause of action.

**B.     Supplemental Jurisdiction**

The supplemental jurisdiction statute provides that:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Plaintiffs' state law claims in Counts II – V arise out of the same circumstances and are so related to their federal claims that they form part of the same case or controversy. *See Lyon v. Whisman*, 45 F.3d 758, 761 (3d Cir.1995). Therefore, the Court has

supplemental jurisdiction over such state law claims based on its original jurisdiction over Plaintiff's federal claim in Count I. Subsection (c) of § 1367, however, provides that a district court may, in its discretion, decline to exercise jurisdiction if any of four conditions are met. One of these conditions is if "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). The Court of Appeals has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (other citations omitted).

At the same time, the Court is mindful of the instruction that if a complaint is vulnerable to 12(b)(6) dismissal, a plaintiff must be permitted a curative amendment, unless an amendment would be inequitable or futile. *Phillips v. Co. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000)). Here, Plaintiff has failed to state a cognizable section 10-b5 claim for which relief can be granted. Such failure is the result of legal deficiencies in the claims, not factual ones in description of what allegedly occurred. The factual background has been adequately described in the complaint as pled; it simply does not provide a litigable basis for relief, as hereinabove explained. As such, the Court finds that an amendment to the complaint would be futile. In view of the fact that the Court will dismiss the single claim over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over the state law claims. Plaintiff is free to pursue its state law claims in the appropriate state court.

**Conclusion**

For the hereinabove stated reasons, the Court will grant in part and deny in part Doc. No. 6, the MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6) OF THE RULES OF FEDERAL PROCEDURE filed by Defendant Rodney J. Chiodo.

An appropriate order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SPECIALTY GRAPHITE SERVICES, INC** *a Pennsylvania Corporation*, <br><br> **Plaintiff,** <br><br> v <br><br> **RODNEY J. CHIODO** *an individual*, <br><br> **Defendant.** | ) ) ) ) ) **2:11-cv-1438** ) ) ) ) ) ) ) ) ) ) |

## ORDER OF COURT

AND NOW, this 19th day of January, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6) OF THE RULES OF FEDERAL PROCEDURE filed by Defendant Rodney J. Chiodo at Doc. No. 6 is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** with respect to Count I, which is **DISMISSED**.  The motion to dismiss is **DENIED** with respect to Counts II – V.

IT IS FURTHER **ORDERED** that the Court declines to exercise supplemental jurisdiction over the state law claims alleged at Counts II, III, IV, and V.

IT IS FINALLY **ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the parties desire to appeal from this Order they must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R.App. P.

The Clerk of Court shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:   **John J. Myers, Esquire**
      Email: jmyers@eckertseamans.com
      **David J. Hopkins, Esquire**
      Email: david@hopkinsheltzel.com